

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

01 APR -6 PM 1: 12

N.D. OF ALABAMA

DAVID M. MARTIN,                           ]
                                           ]
    Plaintiff(s),                      ]
                                           ]
    vs.                                ]   CV-99-N-0911-S
                                           ]
**BLUE CROSS BLUE SHIELD OF**              ]
**ALABAMA,**                               ]
                                           ]
    Defendant(s).                      ]

**ENTERED**

APR 0 6 2001

### Memorandum of Opinion

## I.    Introduction

    This cause comes before the court on the motions for summary judgment, filed respectively by plaintiff David M. Martin ("Martin") and defendant Blue Cross Blue Shield of Alabama ("Blue Cross") on December 29, 2000 (Doc. #'s 27 & 31).[1]  Martin originally commenced this action in the Circuit Court of Jefferson County, Alabama, on February 24, 1999.  Blue Cross removed the case to this Court on April 13, 1999, alleging that the group health benefit plan at issue is part of a "welfare benefit plan" within the meaning of 29 U.S.C. §§ 1001, *et. seq.*  ("ERISA") and, pursuant to ERISA's "super preemption" provisions, plaintiff's state law claims are converted into federal questions.

    On May 14, 1999, Judge Seybourn H. Lynne entered an order (Doc. # 5) striking plaintiff's state law claims, claims for punitive damages and demand for a jury trial.  Soon thereafter, on June 7, 1999, Martin amended the complaint to frame his claims in terms of

---

[1] The Court also has for consideration the motion of defendant to strike plaintiff's demand for trial by jury, filed on December 29, 2000 (Doc. # 28).



ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). The action was transferred to this court on September 21, 2000 (Doc. #18) and, on December 14, 2000, based upon a recent line of decisions in this district, Martin amended the Complaint once again to reassert his state law claims. Both parties have moved the court for summary judgment on all counts in the second amended complaint. The motions have been fully briefed; the parties were afforded an opportunity for oral argument, though they did not take advantage of that opportunity; and it is ripe for decision. Upon due consideration, defendant's motion for summary judgment will be **GRANTED** in all respects, and plaintiff's motion for summary judgment will be **DENIED**.

## II.   Statement of Facts[2]

The facts, as garnered from the affidavits and deposition testimony submitted by the parties but viewed in a light most favorable to the plaintiff, are as follows:

At all times relevant to the claims giving rise to this action, the plaintiff, David. M. Martin, was an employee of J.M. Foster Company, Inc. ("J.M. Foster"). (Def. Ex. A, Pfaffman Dec. at ¶ 2). As a J.M. Foster employee, Martin was insured under the company's group health benefits plan ("J.M. Foster Plan"), issued by defendant Blue Cross. (*Id.*). The J.M. Foster Plan provides coverage for medical services and supplies which are determined to be "medically necessary"[3] by the claims administrator, Blue Cross. (*Id.*).

---

[2] In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[3] In pertinent part, the J.M. Foster Plan provides:

> **BEFORE YOUR HOSPITAL ADMISSION-CAUTION:** One of several

2

requirements for hospital benefits is that we certify the medical necessity of
your hospital stay in advance -- except for emergencies and pregnancies and
when you are admitted to a Concurrent Utilization Review Hospital by a
Preferred Medical Doctor. Emergency and maternity admissions require
notice to us within 48 hours and must also be certified by us as both medically
necessary and as an emergency or maternity admission. . . .**Failure to obtain
our certificate of medical necessity will result in no benefits being paid
for your hospital stay or the admitting physician** . . . .

\*        \*        \*

**EXCLUSIONS**

We **will not** provide benefits for the following:

1.      Services or expenses we determine were not medically necessary. .
        . .

\*        \*        \*

**DEFINITIONS**

\*        \*        \*

23.     Medically Necessary or Medical Necessity: Services or supplies
        which are necessary to treat your illness, injury, or symptom.

To be medically necessary, services or supplies must be determined by Blue
Cross to be:

   a.     appropriate and necessary for the symptoms,
          diagnosis, or treatment of your medical condition;

   b.     provided for the diagnosis or direct care and
          treatment of your medical condition;

   c.     in accordance with standards of good medical
          practice accepted by the organized medical
          community;

   d.     not primarily for the convenience and/or comfort of
          you, your family, your physician, or another provider
          of services;

   e.     not "Investigational"; and

   f.     performed in the least costly setting required by
          your medical condition.

   A "setting" may be your home, a physician's office, a
   Participating Ambulatory Surgical Facility, a hospital's

3

On May 29, 1998, upon the recommendation of his treating physicians and doctors at the University of Alabama, Birmingham ("UAB"), Martin was admitted to Sierra Tucson Medical Facility ("Sierra Tucson") in Tucson, Arizona, for treatment of depression, alcoholism and compulsive gambling.[4]   (Plf. Ex. G; Plf. Ex. H).  In the weeks preceding his admission, several phone conversations took place between Blue Cross representatives and either Martin or his brother-in-law regarding whether the J.M. Foster Plan covered drug and alcohol rehabilitation services.  (Plf. Ex. A, Martin Aff.; Plf. Ex. C).  According to Martin, the decision to check himself into Sierra Tucson was based, in large part, upon coverage representations made by Blue Cross.  (Plf. Ex. A, Martin Aff.).

On Monday, June 1, 1998, Ann Pfaffman R.N. ("Pfaffman"), a Blue Cross patient care representative, received a post admission certification request regarding Martin's Friday, May 29, 1998, admission.  (Def. Ex. A, Pfaffman Dec. at ¶ 5).  Such a request requires Blue Cross to evaluate the medical necessity of the inpatient admission.  (*Id.*).  Based on her review of the information provided, Pfaffman was unable to certify Martin's inpatient

> outpatient department, a hospital when you are an impatient, or another type of facility providing a lesser level of care. Only your medical condition is considered in deciding which setting is medically necessary.  Your financial or family situation, the distance you live from a hospital or other facility, or any other non-medical factor is not considered.  As your medical condition changes, the setting you need may also change.  Ask your physician if any of your services can be performed on an outpatient basis, or in a less costly setting.

(Def. Ex. 1, BCBS-0008, BCBS-0021, BCBS-0027) (emphasis in original).

[4]As part of the admissions process, Dr. Jerry Fitz, M.D. ("Dr. Fitz") conducted an initial physical and psychiatric evaluation of Martin and concluded that he was an "appropriate admission to Sierra Tucson."  (Plf. Ex. D).

4

admission as medically necessary pursuant to the Plan's provisions. (*Id*. at ¶ 6). Pfaffman then forwarded Martin's file to the American Foundation for Health Care ("AFHC"), an independent review organization not affiliated with Blue Cross, to have an independent physician determine whether the treatment requested was medically necessary. (*Id*. at ¶ 7).

On June 2, 1998, John Cranton, M.D. ("Dr. Cranton"), a physician affiliated with AFHC determined, after consulting with Dr. Fitz, Martin's admitting physician, that the impatient admission was not medically necessary. (*Id*. at ¶ 8). Later that same day, Dr. Cranton left a message with Dr. Fitz advising of that determination. (Def. Ex. A, Pfaffman Dec. at ¶ 9). On June 3, 1998, Blue Cross sent a letter to Martin informing him that his admission to Sierra Tucson would not be certified because it was not medically necessary. (*Id*. at ¶ 10, Def. Ex. 1, BCBS-0150). Blue Cross also informed Dr. Fitz and Sierra Tucson of the decision on this date by way of telephone calls. (Def. Ex. A, Pfaffman Dec. at ¶ 10).

Martin received treatment at Sierra Tucson from May 29, 1998, through June 23, 1998. (Plf. Ex. I). As a consequence of his treatment, Martin incurred medical and hospital charges in excess of $17,990.86. (Plf. Ex. A, Martin Aff.). Sierra Tucson submitted a claim for the admission to Blue Cross. (Def. Ex. A, Pfaffman Dec. at ¶ 11). On August 10, 1998, Blue Cross sent a letter to Martin informing him that his May 29, 1998, hospital claim was being denied because the medical information did not indicate that his admission was medically necessary. (*Id*.). In accord with the administrative remedies provided pursuant to the J.M. Foster Plan, Martin twice appealed the denial of his hospital claim.

5

In support of his first appeal, Martin submitted a letter from Lawrence S. Hawley, M.D. ("Dr. Hawley"), his treating physician, suggesting that Martin had suffered from a "long history of depression and self destructive behavior with alcoholism" and that treatment at Sierra Tucson was of great help in turning Martin's life around. (Plf. Ex. G). Blue Cross forwarded Dr. Hawley's letter, along with the medical records from Sierra Tucson, to a second independent medical doctor, Mark Feldman, M.D. ("Dr. Feldman"), for a determination as to whether the treatment was medically necessary. (Def. Ex. A, Pfaffman Dec. at ¶ 13). After reviewing the materials, Dr. Feldman determined that the information made available to him did not demonstrate that Martin's treatment was medically necessary because, among other things, the records did not show the necessity for an acute level of care. (*Id.* at ¶ 14; Def. Ex. 1, BCBS-0148). Based on Dr. Feldman's medical opinion, Blue Cross, through Pfaffman, determined that admission was not medically necessary and, therefore, was not covered under the J.M. Foster Plan. (Def. Ex. A, Pfaffman Dec. at ¶ 15). On November 3, 1998, Pfaffman sent a letter to Dr. Hawley and Mr. Martin informing them that, based on a thorough review of the medical records, the decision to deny certification was being upheld. (*Id.*).

Martin took a second appeal of the denial of his hospital claim, which was supported by a November 10, 1998, memo from Jack G. Modell, M.D. ("Dr. Modell"), Professor of Psychiatry at UAB. Dr. Modell's memo indicated that (1) he was familiar with Martin's file, (2) that no facility in or near Alabama provides the comprehensive and intensive treatment available at Sierra Tucson, (3) he recommended Mr. Martin to be admitted to Sierra Tucson because his needs matched the treatment available there but not with local programs, and

6

(4) the cost of the Sierra Tucson program is less than UAB's program and some other local and regional programs. (Plf. Ex. H). Pfaffman then sent Martin's file back to the AFHC and requested that a third medical doctor review the file and render an opinion as to whether Martin's acute inpatient admission was medically necessary. (Def. Ex. A.; Pfaffman Dec. at ¶ 18). After reviewing the file, Manuel Cepeda, M.D. (" Dr. Cepeda") concluded that the impatient admission was not medically necessary. (*Id.* at ¶ 19; Def. Ex. 1, BCBS-0168). Based on Dr. Cepeda's medical opinion, Pfaffman determined that the denial should stand. (Def. Ex. A, Pfaffman Dec. at ¶ 20). On December 7, 1998, Pfaffman sent Dr. Modell and Martin a letter stating, in part, that based on the opinions of three medical doctors, Blue Cross had decided to uphold the non-certification.[5] (*Id.*). A few months later, on February 24, 1999, Martin filed the instant lawsuit.

## III. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

---

[5] All three independent reviewers (Dr. Cranton, Dr. Feldman, and Dr. Cepeda) were provided with the "medical necessity" provisions contained in the J.M. Foster Plan prior to their review. (Def. Ex. A, Pfaffman Dec. at ¶ 25).

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a

8

reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

9

## IV.   Discussion

### A.   The ERISA Claim

#### 1.   Section 1132(a)(1)(B) Benefits

As noted above, Blue Cross denied Martin's claim for expenses incurred in connection with his impatient admission at Sierra Tucson on the basis that such treatment was not "medically necessary" as that term is defined in the J.M. Foster Plan. Martin takes issue with Blue Cross' determination and, pursuant to 29 U.S.C. § 1132(a)(1)(B), moves the court to award benefits on summary judgment. *See* 29 U.S.C. § 1132(a)(1)(B) (providing participants and beneficiaries with standing to bring civil actions for the recovery of benefits "due . . . under the terms of [the] plan, to enforce . . . rights under the terms of the plan, or to clarify . . . rights to future benefits under the terms of the plan . . ."). In its cross motion for summary judgment, Blue Cross, the claims administrator, maintains that its benefits determination can withstand even the most rigorous review.

As a threshold matter, the court must determine the proper standard of review to apply to the claims administrator's decision to deny Martin's hospital claim. Although the ERISA statute does not provide a standard to review the decisions of an administrator or fiduciary, the Supreme Court has held that the denial of plan benefits must be reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956 103 L. Ed. 2d 80 (1989). If the administrator is given discretionary powers under the plan, the court must review the administrator's *interpretation* of the terms of the plan as well as any *factual determinations*

10

under the arbitrary and capricious standard. *See Paramore v. Delta Air Lines*, 129 F.3d 1446, 1451 (11th Cir. 1997). In order to trigger the arbitrary and capricious standard, however, the language conferring discretion upon the administrator must be "express language unambiguous in design." *Kirwan v. Marriot Corp.*, 10 F.3d 784, 789 (11th Cir. 1994).

The J.M. Foster Plan contains the following provision:

> Blue Cross has complete discretion to interpret the provisions
> of the Plan. Its administrative functions include paying claims,
> determining medical necessity, etc.

(Def. Ex. 1, BSBS-0032). The court finds that the foregoing language is sufficient to establish Blue Cross' authority to find facts and construe the terms of the J.M. Foster Plan. In fact, as Blue Cross points out, the Eleventh Circuit has held that substantially similar language confers discretionary authority. *See Lee v. Blue Cross Blue Shield of Alabama*, 10 F.3d 1547, 1550 (11th Cir. 1994); *Jett v. Blue Cross & Blue Shield Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989). For this reason, at a minimum, the arbitrary and capricious standard of review is applicable. However, because Martin alleges that Blue Cross was operating under a conflict of interest at the time it made its benefits determination, the court's analysis does not end at this juncture.

Where the administrator with discretion is operating under a conflict of interest, its *plan interpretations* are reviewed under a heightened arbitrary and capricious standard.[6]

---

[6]The application of the heightened arbitrary and capricious standard results from a culmination of the following steps. First, the court seeks to ascertain whether the administrator's plan interpretations are "wrong" from the perspective of *de novo* review. *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co*, 240 F.3d 982, 993 (11th Cir. 2001). If the court finds that the administrator's interpretation is wrong, the court then decides whether the claimant has proposed a reasonable alternative interpretation. *HCA Health Servs.*, 240 F.3d at 994. Even if the claimant demonstrates that his or her plan interpretation is reasonable, the claimant does not

11

*HCA Health Servs. of Ga. Inc., v. Employers Health Ins. Co.*, 240 F.3d 982, 993 (11th Cir. 2001); *Brown v. Blue Cross & Blue Shield, Inc.*, 898 F.2d 1556, 1561 (11th Cir. 1990), *cert. denied.*, 111 S. Ct. 712 (1991). Here, while Martin contends that the claims administrator was operating under such a conflict,[7] he apparently does not take issue with the claims administrator's interpretation of the Plan's rather unambiguous "medical necessity" provision.[8] Instead, Martin contends that the claims administrator's *factual determination* that the treatment he received at Sierra Tucson was not medically necessary, as that term is interpreted by the claims administrator, lacks support in the medical evidence of record. Blue Cross, on the other hand, maintains that its determination that Martin's treatment was not medically necessary is not only reasonable, but correct.

Unfortunately, the Eleventh Circuit has yet to address the standard for reviewing an administrator's factual determinations where the plan affords the administrator discretion and the administrator is operating under a conflict of interest. *See Lake v. Unum Life Ins. Co. of Am.*, 50 F. Supp. 2d 1243, 1252 (M.D. Ala. 1999). However, reasoning that "a conflict of interest could have an equally pernicious effect on a plan administrator's factual

---

necessarily prevail. *Id*. Instead, if the administrator's wrong interpretation is also reasonable, then this wrong but reasonable interpretation is entitled to deference. *Id*. The administrator's interpretation is not necessarily entitled to deference, however, if the administrator is operating under a conflict of interest. *Id*. If such a conflict exists, the burden shifts to the claims administrator to prove that its plan interpretation is not tainted by self interest. *Id*. at 994. Even if the claims administrator satisfies this burden, the court will allow the claimant to demonstrate, by other measures, that the administrator's plan interpretation is arbitrary and capricious. *HCA Health Servs*., 240 F.3d at 994.

[7] Martin argues that a less deferential standard should apply because Blue Cross, acting as both claims administrator and insurer, operates under a conflict of interest when it denies the claims of its participants. Stated differently, according to Martin, if Blue Cross denies the claims of its participants, it enjoys a direct pecuniary gain in the form of expenses avoided. Given that Blue Cross does not address the merit of Martin's contention, the court will assume, for purposes of summary judgment, that such a conflict of interest exists.

[8] *See infra*, note 3.

determinations as on the interpretation of a contract term," the district court in *Lake* modified the burden shifting analysis applicable to challenged plan interpretations in order to accommodate similar challenges involving factual determinations. *Id.* at 1253. According to *Lake*, the court must first examine whether the claimant has demonstrated that his or her version of the facts is supported by the record. *Id.* If the claimant shows that his or her factual allegations are supported in the record, the court will draw all inferences from the facts against the administrator, to find that the administrator's decisions are "wrong." *Id.* The administrator's "wrong" decision is nonetheless entitled to deference so long as the decision is "reasonable." *See id.* The claims administrator's determination is not necessarily entitled deference, however, if the administrator is operating under a conflict of interest. If such a conflict exists, the burden shifts to the claims administrator to prove that its factual determination is not tainted by self interest. *See id.* Even if the claims administrator satisfies this burden, the court will allow the claimant to demonstrate, by other measures, that the factual determination was arbitrary and capricious. *See Lake*, 50 F. Supp. 2d. at 1253.

In the present case, the court is convinced that the claims administrator's factual determinations are "correct" from the perspective of *de novo* review, the least deferential standard of review. For this reason, without deciding whether to adopt a modified burden shifting analysis similar to the one announced in *Lake* or, alternatively, to develop a new standard for reviewing the factual determinations of a conflicted administrator acting with discretion, the claims administrator's decision to deny Martin's hospital claim will not be disturbed by the court.

13

As noted above, on March 29, 1998, Martin was admitted to Sierra Tucson, an out-of-state facility, for inpatient treatment of alcoholism, depression and compulsive gambling. A few days into his twenty-five day impatient stay, Pfaffman, a Blue Cross patient care representative, received a post-admission request to certify Martin's admission as "medically necessary" under the J.M. Foster Plan. A "medically necessary" admission is one that, among other considerations, is performed in the "least costly setting" required by the member's medical condition. (Def. Ex. 1, BCBS-0027). Pfaffman was unable to certify Martin's admission as a medical necessity and, therefore, immediately forwarded Martin's medical file, along with the medical necessity provisions contained in the J.M. Foster Plan, to Dr. Cranton, an independent physician unaffiliated with Blue Cross, with instructions to review her initial decision.

After consulting with Dr. Fitz, Martin's admitting physician, Dr. Cranton recommended that the denial be upheld. According to his referral form, Dr. Cranton based his recommendation on the following factors: (1) Martin's medical history included no record of failed outpatient care, (2) the record documented no justification for an acute hospital admission, and (3) it appeared that Martin could have been treated at a lesser level of care. (Def. Ex. 1, BCBS-0139). On June 3, 1998, a few days after his inpatient admission, Blue Cross sent Martin a letter informing him, in pertinent part, that the admission could not be certified because "evaluation and treatment could have been provided in an alternative setting." (Def. Ex. 1, BCBS-0150).

In accord with the administrative remedies afforded pursuant to the J.M. Foster Plan, Martin appealed, on two separate occasions, the denial of his hospital claim. However,

after reviewing Martin's medical file as well as the "medical necessity" provisions contained in the J.M. Foster Plan, two independent physicians, Dr. Feldman[9] and Dr. Cepeda,[10] both concluded that the symptoms Martin exhibited prior to admission did not justify an acute, twenty-five day inpatient stay at an out-of-state facility. Based on the medical opinions of Dr. Cranton, Dr. Feldman, and Dr. Cepeda, Blue Cross decided to uphold its initial denial on grounds that Martin's inpatient admission for treatment of

---

[9]Dr. Feldman opined:

> [T]he information made available to me does not demonstrate that the patient met medical-necessity criteria for the acute level of care for insurance purposes. He was not actively suicidal, homicidal, or psychotic. He was not functionally incapacitated. He did not have comorbid medical/surgical or psychiatric problems to compel the acute level of care. I am unable to recommend certification of any of the dates requested in this case.

(Def. Ex. 1, BCBS-0148).

[10]Dr. Cepeda opined:

> The discharge summary indicated the reasons for hospitalization were to 1) deal with alcohol dependency, 2) deal with nicotine dependence. The admission history and physical the day following the admission indicated that the patient's last alcohol consumption had been 48 hours previously. At the time he was "neat, well-groomed, pleasant and cooperative" with no evidence of withdrawal. His affect was labile. Eye contact was good. No psychotic symptomology was present. Suicide attempts in the past and present were denied.
>
> Throughout the period of hospitalization the patient did not develop significant withdrawal symptoms and did not develop incapacitating melancholic symptomology. He did participate in the treatment program. Discharge recommendations included that he continue to be involved in therapy (including therapy with his spouse) and that he attend Alcoholics Anonymous meetings and Gamblers Anonymous meetings. He did express his willingness to get a sponser.
>
> I cannot appreciate the medical necessity for the admission. This is a problem that could have been treated at a lesser level of care.

(Def. Ex. 1, BCBS-0168).

15

alcoholism, gambling and depression was not "medically necessary" because treatment was not performed in the "least costly setting" required by his medical condition. (Def. Ex. 1, BCBS-0027, 0157, 0162). In other words, Blue Cross was convinced that Martin's condition could have been effectively treated on an outpatient basis.

In an effort to convince the court that Blue Cross' factual determinations were unreasonable, or at the very least incorrect from the perspective of *de novo* review, Martin proffers several arguments. Martin initially contends that Pfaffman, the Blue Cross representative who declined to certify Martin's admission as a "medical necessity," failed to gather necessary medical records, and lacks the requisite knowledge and skill to make medical determinations. He points out that his admitting physician, Dr. Fitz, concluded that he was an "appropriate admission" at Sierra Tucson and that his treating physicians in Birmingham, Alabama, Dr. Hawley and Dr. Modell, "confirmed" the medical necessity of Martin's treatment in two separate letters to Blue Cross. He also argues that, while the initial denial was based upon a determination that his treatment was not medically necessary, Blue Cross "conveniently" changed the basis of its decision to conform with the opinions of its "independent" physician reviewers.

Even without attributing any special weight to the claims administrator's factual findings, the court finds Martin's arguments unpersuasive. First of all, Martin's contention that Pfaffman failed to gather medical records and/or is unqualified to make medical determinations is misplaced. The issue before the court is not whether the claims administrator, for lack of evidence or otherwise, improperly declined to *certify* Martin's admission as a medical necessity. Rather, the court is concerned with whether the claims

16

administrator's *final* determination that Martin's treatment was not medically necessary was correct.  This final determination, a determination made after two unsuccessful administrative appeals, provides the court with a more complete record of the basis for the claims administrator's decision.[11]

As for the medical opinions of Dr. Hawley and Dr. Modell, Martin's treating physicians, the court is convinced that these opinions shed very little light on the "medical necessity" of Martin's treatment at Sierra Tucson.  In support of Martin's first appeal, Dr. Hawley advised Blue Cross that:

> [Martin] is a patient of mine with a long history of depression and self-destructive behavior with alcoholism, and he was hospitalized at Sierra Tucson, a rehabilitation hospital in Catalina, Arizona, in May of this year.  The program was a great help to Mr. Martin in turning his life around, and he has stayed off alcohol since his discharge from that facility.
>
> In the past, though he was able to give up cigarettes for a considerable period on his own and though he tried outpatient antidepressant therapy, he was never able to effectively deal with the demons of alcohol and I would hope you would show him every consideration in helping him cover the cost of this program of treatment.

(Plf. Ex. G).  In support of Martin's second appeal, Dr. Modell stated:

> I recently learned that BCBS has denied payment for treatment of Mr. Martin at the Sierra-Tucson drug and alcohol treatment facility on the basis that treatment locally would have sufficed.  As you may know, I have been involved at UAB in alcoholism research and treatment since 1991 and am, therefore, very familiar with both local and national treatment facilities.  Please be advised of the following:

---

[11]There is no suggestion that Blue Cross' appeals process failed to provide Martin a reasonable opportunity to obtain a full and fair review of his hospital claim.  *See* 20 C.F.R. § 2560.503-1(g)(1).

> 1) There is no treatment facility in or near Alabama that
> provides treatment that is as comprehensive and intensive as
> that provided by the Sierra-Tucson facility.
>
> 2) It was I who recommended treatment at Sierra-Tucson for
> this patient because this patient's needs were well-matched
> with the treatment provided by this program, but not with any
> local treatment programs.
>
> 3) The costs of the Sierra-Tucson treatment program is actually
> *less* than the program offered by UAB and some of the
> local/regional programs.
>
> For these reasons, it is unclear to me why any available
> insurance benefits would be denied to this patient because
> treatment was not provided locally; I would, therefore,
> encourage re-evaluation of Mr. Martin's claim.

(Plf. Ex. H.). First of all, Blue Cross does not suggest that the treatment Martin received was

unsuccessful, or that its decision to deny benefits was premised upon whether treatment

was successful or unsuccessful. To the contrary, Blue Cross has consistently maintained

that benefits were denied because Martin could have been treated in a less costly setting.

In other words, regardless of the "comprehensive and intensive" nature of treatment

provided by the Sierra Tucson facility, or the fact that such a program is not available in or

near Alabama, Blue Cross takes the position that, given he was not suicidal, homicidal, or

even suffering from withdrawal symptoms at the time of his admission, Martin could have

been successfully treated on an outpatient basis. The medical opinions of Dr. Hawley and

Dr. Modell simply provide little information to support a conclusion contrary to the one

reached by the claims administrator. In fact, based upon a review of their respective

18

opinions, the court questions whether either doctor had knowledge of the Plan's "medical necessity" provision at the time they urged Blue Cross to reconsider its benefits decision.[12]

Martin's contention that the claims administrator "conveniently" altered the basis of its decision in order to conform with the opinions of its "independent" physician reviewers is equally unavailing. As stated above, the J.M. Foster Plan provides that the claims administrator will not pay for services or supplies that are deemed to be not medically necessary. (Def. Ex. 1, BCBS-0021). A medically necessary service or supply is one that, among other considerations, is "performed in the least costly setting required by your medical condition." (*Id*. at BCBS-0027). In its initial denial, dated August 10, 1998, Blue Cross denied Martin's claim because "the information we have does not indicate that this patient's admission was medically necessary . . . benefits are not available unless hospital confinement is medically necessary." (Plf. Ex. E, BCBS-0056). On appeal, the claims administrator twice upheld the initial denial on grounds that Martin could have been treated at a "lesser level of care" or in an "alternate setting." (Def. Ex. A, BCBS-0162). Blue Cross points out, and the court agrees, that the phrases "level of care" and "alternate setting" are simply elements of medical necessity rather than an independent basis for denying Martin's claim.

In short, after conducting a *de novo* review of the claims administrator's factual findings, the court is convinced that the claims administrator correctly determined that

---

[12] It has not escaped the court that neither Martin nor his treating physicians have proffered any medical evidence suggesting that the independent physician reviewers' determination that Martin was not suicidal, psychotic, homicidal, or even suffering from withdrawal symptoms prior to his inpatient admission was either incorrect or lacking support in the medical evidence of record.

19

Martin's twenty-five day impatient stay in an out-of-state facility for the treatment of alcoholism, gambling and depression was not "medically necessary" as that term is defined in the J.M. Foster Plan. Since the claims administrator's factual determinations are correct from the perspective of *de novo* review, the court declines to decide the proper standard for reviewing an administrator's factual determinations where the plan affords the administrator discretion and the administrator is operating under a conflict of interest.

### 2. Equitable Estoppel within the Section 1132(a)(1)(B) Context

According to Martin, even if the treatment he received is not covered under the terms of the J.M. Foster Plan, Blue Cross is estopped from denying benefits based on the oral statements of its employees representing that such benefits would be available. Specifically, Martin maintains that the decision to check himself into the Sierra Tucson facility was based, in large part, upon his brother-in-law's telephone conversations with Cari Sides, a Blue Cross representative. Assuming, without deciding, that Martin's contention finds support in the evidence of record, his equitable estoppel claim must nevertheless fail.

In *Glass v. United of Omaha Life Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994), the Eleventh Circuit recognized that while ERISA is a "comprehensive" federal welfare benefit regulatory scheme, the statute has "gaps" that Congress expected courts to fill with "a federal common law of rights and obligations under ERISA-regulated plans." *Glass*, 33 F.3d at 1347 (quoting *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S. Ct. 1549, 1557, 95 L. Ed. 2d 39 (1987)). In filling these "gaps," this Circuit "[h]as created a very narrow common law doctrine under ERISA for equitable estoppel" when the provisions of the plan are at issue. *Id.* at 1347. Equitable estoppel is only available when: (1) the provisions of the plan

20

at issue are ambiguous, and (2) representations are made which constitute an oral interpretation of the ambiguity. *Id*. Stated differently, equitable estoppel is not available for unambiguous written plans or oral modifications of the plan. *Id*. (citing *Alday v. Container Corp. of America*, 906 F.2d 660, 666 (11th Cir. 1990)).

The court has already recognized, and Martin apparently concedes, that the "medical necessity" provision at issue in this case is not ambiguous; it clearly permits the claims administrator to deny hospital claims that, among other considerations, are not performed in the "least costly setting" required by the member's medical condition. (Def. Ex. A, BCBS-0027). A "setting," according to the Plan, "may be your home, a physician's office, a Participating Ambulatory Surgical Facility, a hospital's outpatient department, a hospital when you are an inpatient, or another type of facility providing a lesser level of care." (*Id*.). Accordingly, even assuming that Blue Cross employees represented that Martin's treatment would be "covered," those representations would, at most, constitute an oral modification of an unambiguous plan. As previously stated, such oral modifications do not provide a basis for application of the principle of equitable estoppel. To do so would require the court "to .disregard the plain language of the plan in order to demand that insurers provide coverage for which no premium has been - or ever will be - paid." *Novak v. Irwin Yacht & Marine Corp.*, 986 F.2d 468, 472 (11th Cir. 1993) (quoting *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 57 (4th Cir. 1992)). Summary judgment will be granted in favor of Blue Cross as to Martin's § 1132(a)(1)(B) "wrongful denial of benefits" claim. Martin's cross motion for summary judgment will be denied.

21

## B. State Law Claims

As previously noted, prior to transfer of the present action to this court, Judge Seybourn H. Lynne entered an order striking Martin's fraud claims, demand for punitive damages, and demand for jury trial. (Doc. #5, entered March 14, 1999). On December 8, 2000, Martin successfully moved this court, based upon a recent line of decisions in this district, to amend the complaint to reassert his state law claims for fraud, suppression and bad faith. Upon close examination, the decisions Martin relies upon to prop up his state law claims, *Hill v. Blue Cross Blue Shield*, 117 F. Supp. 2d 1209 (N.D. Ala. 2000) and *Gilbert v. Alta Health & Life Ins. Co.*, 2000 WL 1770650 (N.D. Ala. 2000), are limited to the narrow question of whether ERISA's "savings clause" exempts Alabama's bad faith tort cause of action from preemption. Those decisions provide absolutely no basis for revisiting Judge Lynn's determination that Martin's generic fraud and suppression claims "relate to" a welfare benefit plan and, as such, are preempted. As Martin's fraud claims are clearly preempted, summary judgment as to these claims will be granted in favor of Blue Cross.

Finally, in light of the court's finding that Blue Cross properly denied Martin's hospital claim, Martin's claim of bad faith failure to pay must necessarily fail. In other words, even if Martin could convince the court that his bad faith claim is saved from preemption by ERISA's "savings clause," a task the court finds highly unlikely, he simply cannot raise a genuine issue of material fact as to the elements of his claim. The five elements of a successful bad faith claim are as follows: "(1) that there was 'an insurance contract between the parties'; (2) ' an intentional refusal to pay the insured's claims'; (3) 'the absence of any reasonably legitimate or arguable reason for refusal'; (4) 'the insurer's

22

actual knowledge of the absence of any legitimate or arguable reason'; and (5) 'if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must provide the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'" *Smith v. MBL Assurance Corp.*, 589 So. 2d 691, 697 (Ala. 1991) (quoting *National Sec. Fire & Cas. Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982)). It stands to reason that, if Blue Cross' decision to deny benefits was correct from the perspective of *de novo* review, Blue Cross unquestionably had a "legitimate or reasonable" reason for refusing to pay Martin's claim. Accordingly, summary judgment on Martin's bad faith claim will be granted in favor of Blue Cross.

## V.    Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion granting defendant's motion for summary judgment in all respects, and denying plaintiff's motion for summary judgment.

Done, this _____ of April, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

23